**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

LONNIE RAY MOORE, Jr.,

    *Plaintiff*,

v.                                       CASE NO. 11-CV-11857

COMMISSIONER OF               DISTRICT JUDGE DAVID M. LAWSON
SOCIAL SECURITY,                MAGISTRATE JUDGE CHARLES E. BINDER

    *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

**I.    RECOMMENDATION**

In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED**, that Defendant's Motion for Summary Judgment be **DENIED**, and that the case be **REMANDED** for an **AWARD OF BENEFITS**.

**II.    REPORT**

    **A.    Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for a period of disability and Disability

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Insurance Benefits ("DIB"), and for Supplemental Security Income ("SSI") benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 11, 14, 15.)

Plaintiff was 31 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 8 at 36, 102, 106,111.) Plaintiff's employment history includes work as a truck driver, cashier, and dishwasher. (Tr. at 145.) Plaintiff filed the instant claims on June 13, 2008, alleging that he became unable to work on May 1, 2008.[2] (Tr. at 111.) The claims were denied at the initial administrative stages. (Tr. at 53, 54.) In denying Plaintiff's claims, the Commissioner considered epilepsy, depressive disorder NOS and mood disorder NOS as possible bases for disability. (*Id.*) On February 16, 2010, Plaintiff appeared before Administrative Law Judge ("ALJ") Troy M. Patterson, who considered the application for benefits *de novo*. (Tr. at 12-31, 36-52.) In a decision dated April 8, 2010, the ALJ found that Plaintiff was not disabled. (Tr. at 31.) Plaintiff requested a review of this decision on April 30, 2010. (Tr. at 9-11.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on March 3, 2011, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-4.) On April 27, 2011, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

**B.     Standard of Review**

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the

---

[2]Plaintiff amended his claims on June 17, 2008.

agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability"). "However, the ALJ is not free to make credibility determinations

based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence

4

No

without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

### C. Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the SSI program of Title XVI, 42 U.S.C. §§ 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe

5

impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.     ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through June 30, 2013, and that Plaintiff had not engaged in substantial gainful activity since May 1, 2008, the alleged onset date. (Tr. at 17.) At step two, the ALJ found that Plaintiff's seizures, secondary to a remote closed-head injury, depression, mood disorder, bipolar disorder, and polysubstance dependence were "severe"

within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 18-20.) At step four, the ALJ found that Plaintiff could not perform any of his past relevant work. (Tr. at 29.) The ALJ also found that on the alleged disability onset date, Plaintiff was a younger individual age 18 to 49. (*Id.*) At step five, the ALJ found that Plaintiff could perform a full range of work at all exertional levels with the following nonexertional limitations: that he is restricted to jobs that would not expose him to unprotected heights or dangerous machinery; and that he is restricted to jobs that involve only superficial interpersonal contact with coworkers, supervisors, and the public. (Tr. at 20-29.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 30-31.)

### E. Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff has been treated for epilepsy and seizures since 2003. (Tr. at 221.) In 2003, Plaintiff was in a snowboarding accident and suffered a closed head injury. (Tr. at 224, 293.) On November 21, 2005, an EEG was "normal" with "no epileptiform discharges noted." (Tr. at 317.)

Plaintiff was treated by D. Pasupuleti, M.D., for his seizures. On January 24, 2007, Dr. Pasupuleti noted that Plaintiff's seizures were "well controlled on Depakote" and that he was "doing remarkably well except for the fact that he feels somewhat depressed and it is somewhat a situational reaction because he used to be a semi truck driver and used to make a lot of money, now he does not have a job, has tried different jobs and is not able to get any with 'Michigan unemployment.'" (Tr. at 194.) Dr. Pasupuleti referred Plaintiff to a psychiatrist and suggested "some type of job rehabilitation" or "occupational training" since, even if Plaintiff were to qualify

for a driver's license, the job of truck driver would be "hazardous not only to him but for others[.]" (Tr. at 194.)

Plaintiff was treated in the emergency room on May 19, 2007, for a seizure and his discharge instructions warned that he "need[s] to quit smoking marijuana because it [can or will] increase [his] chance to have a seizure." (Tr. at 188-90, 196-98.) On June 13, 2007, Dr. Pasupuleti noted that Plaintiff's most recent CT scan "showed no significant abnormalities" but that his EEG "was full of artifact, not able to be interpretable." (Tr. at 185, 199.) Dr. Pasupuleti also made changes to Plaintiff's prescription medicine regimen. (*Id.*)

On January 31, 2008, Plaintiff was referred to Faisal I. Ahmad, M.D., for an examination and consultation. (Tr. at 221-22, 368-69.) Dr. Ahmad opined that Plaintiff's seizures "may be partial seizures with secondary generalization" and that his "normal, nonlateralizing neurological examination is reassuring." (Tr. at 222, 369.)

On February 13 and April 20, 2008, Plaintiff was treated in the emergency room for seizures (convulsive epilepsy). (Tr. at 206-16.) On February 25, 2008, Plaintiff underwent an EEG which was normal. (Tr. at 218, 252, 366-67.) The seizure on April 20, 2008, was a "breakthrough seizure" where Plaintiff recalled "waking up in the morning with diffuse pain and soaked in urine." (Tr. at 217, 251.) On April 28, 2008, Dr. Ahmad increased Plaintiff's dosage of Depakote, an anticonvulsant medicine. (*Id.*)

On July 7, 2008, Plaintiff sought mental health treatment with New Passages because of depression from going through a divorce and feeling that his wife was putting their daughter in the middle. (Tr. at 223, 224-30, 237-47.) On July 14, 2008, Plaintiff's counselor at New Passages noted that Plaintiff "reports 0 depression and 0 anxiety due to using his coping skills taught by CM" and that Plaintiff "reports his ex-wife is a trigger point that [was] causing frustration, anger

8

aggitat[ion], [feelings of being] overwhelmed, [and] anxiety." (Tr. at 233.) On July 15, 2008, it was noted that Plaintiff was doing well, was sleeping better, had more energy than he had experienced in a year, and noted a "huge 'reduction in his anger, depression and anxiety.'" (Tr. at 231.)

On July 21, 2008, Dr. Ahmad indicated he would "transition [Plaintiff] to Keppra monotherapy." (Tr. at 249.)

Plaintiff sought mental health treatment beginning in July 2008 with Catholic Services because he was having suicidal ideations and attempted to overdose, although Plaintiff indicated that "his daughter is the reason for his life and why he wants to stay alive." (Tr. at 265.) On July 31, 2008, it was noted that Plaintiff "appeared to be on the verge of tears" throughout the counseling session. (Tr. at 263.) Plaintiff was assessed with bipolar disorder, most recent episode mixed, rapid recycling, and cannabis abuse, and was given a GAF score of 45 upon intake. (Tr. at 266.) On August 7, 2008, it was noted that Plaintiff was working toward controlling his anger and eliminating aggressive behavior so that he could possibly reunite with his family. (Tr. at 260.) It was also noted that Plaintiff "[c]urrently smokes cannabis every day," "[u]sed cocaine for 4-6 months last year" and "[u]ses alcohol (beer) on weekends." (Tr. at 262.)

A Physical Residual Functional Capacity ("RFC") Assessment was completed on September 15, 2008. (Tr. at 292-97.) The assessment concluded that Plaintiff was able to occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour day. (Tr. at 293.) Plaintiff was also found to be frequently limited in all postural areas except for being only occasionally limited in his ability to climb stairs; it was noted that he should never climb ladders or scaffolds. (Tr. at 294.) There were no manipulative, visual, or communicative limitations established. (Tr. at 295-96.) The only environmental limitation established was to avoid all exposure to hazards. (Tr. at 296.) The

9

assessment noted that Plaintiff's "seizures are fairly-well controlled, but in consideration of his occasional break-through seizures, he should not work in proximity of moving machinery or off floor level." (Tr. at 295.) The assessment concluded that "[w]hile some functional limitation would be reasonable given MDI [medically determinable impairment], claimant's alleged functional limitations are so far-reaching that they lose credibility." (Tr. at 297.)

On September 23, 2008, Plaintiff was assessed at the Seasons Counseling Center and diagnosed with "Depressive Disorder NOS," "Mood Disorder NOS," "History of Marijuana and Alcohol Abuse," and was given a GAF score of 55 and a guarded prognosis. (Tr. at 272.)

A Psychiatric Review Technique was completed on September 24, 2008, by Leonard C. Balunas, Ph.D. (Tr. at 274-87.) Plaintiff was diagnosed with affective disorders, i.e., "Depressive DO, NOS" and "Mood DO, NOS." (Tr. at 274, 277.) Plaintiff was found to be mildly limited in activities of daily living and in maintaining social functioning. (Tr. at 284.) He was found to be moderately limited in maintaining concentration, persistence, or pace. (*Id.*)

A Mental RFC Assessment completed on September 24, 2008, concluded that Plaintiff was moderately limited in the ability to understand and remember detailed instructions, to carry out detailed instructions, and to maintain attention and concentration for extended periods, but was otherwise not significantly limited in understanding, memory, sustained concentration and persistence. (Tr. at 288-89.) It was concluded that Plaintiff was not significantly limited in any areas of social interaction or adaptation. (Tr. at 289.) The assessment also concluded that Plaintiff was "able to perform unskilled work involving 1 and 2 step instructions with limited need for sustained concentration." (Tr. at 290.)

On October 15, 2008, Dr. Ahmad indicated that he had re-ordered a 48-hour ambulatory EEG study due to the failure of the equipment when the test was ordered in July 2008. (Tr. at 363-64.)

On March 12, 2009, Dr. Pasupuleti stated that "as long as [Plaintiff] takes antiepileptic medications he seems to be doing fine." (Tr. at 313.) On April 10, 2009, an MRI of Plaintiff's brain was normal except for "three local hyperintense [] foci . . ., two of which are stable in the bilateral frontal lobes and a new one in the left occipital lobe." (Tr. at 316.) The report stated that these were "non-specific, but may relate to small areas of gliosis, especially if the patient has had a prior history of head trauma." (*Id.*) "Other possibilities include relation to migraine headaches." (*Id.*)

On June 29, 2009, Plaintiff visited Dr. Pasupuleti and reported he was "doing well and has had no seizures." (Tr. at 311.) Dr. Pasupuleti noted that an EEG taken on June 26, 2009, was normal. (Tr at 311, 314.) On July 23, 2009, however, two weeks after Plaintiff stopped taking his medications because he thought he didn't have epilepsy, Plaintiff had a "generalized tonic-clonic seizure with tongue bite" that Plaintiff thought was "the worst seizure he has ever had," which was followed by a terrible headache for three hours. (Tr. at 310.)

On February 2, 2010, Dr. Pasupuleti wrote to Dr. Kasperowicz and cautioned that "most of the [anticonvulsant] medications I use do interact with other medication, and sometimes they even lower the seizure threshold and cause seizures." (Tr. at 309.) Dr. Pasupuleti noted that he "cautioned [Plaintiff] to let his psychiatrist or psychologist know that he is on Keppra." (Tr. at 309.)

On February 4, 2010, Plaintiff was evaluated at New Passages with the goal of obtaining and maintaining psychiatric stability. (Tr. at 322.) It was noted that his girlfriend was providing emotional and financial support. (*Id.*) It was noted that Plaintiff stated, "I don't have any physical

11

health concerns right now." (Tr. at 323.) Plaintiff continued counseling with New Passages through March 2010. (Tr. at 320-59, 370-403.)

In his Daily Function Report, Plaintiff indicated that after he eats breakfast, he "tr[ies] to look for work all day [and] get[s] turned down 100% of the time because of my medical condition." (Tr. at 158.) Plaintiff stated that his condition causes "shakiness, tremors, weird and disturbing dreams [and] depression." (Tr. at 159.) Plaintiff is able to care for his own personal care except that his shakiness makes it difficult to shave at times. (*Id.*) Although Plaintiff is able to cook, he needs his "wife and daughter [to] watch me, if I have a seizure while cooking, it could be very dangerous." (Tr. at 160.) Plaintiff also cleans his house about three times a week. (*Id.*) Plaintiff is able to ride in a car, walk, and shop in stores for groceries and household items but is not able to drive because he must be seizure-free for at least six months to obtain a license and he usually has seizures approximately every three months. (Tr. at 161.) Plaintiff is able to manage his own finances and he watches television and reads, but no longer plays video games since they can "bring on a seizure." (Tr. at 161-62.) Plaintiff indicated that he can walk about one quarter of a mile before needing to stop and rest for ten minutes. (Tr. at 163.)

At the administrative hearing, Plaintiff testified that he was fired from his most recent job at Walmart because he missed too many days of work. (Tr. at 41.) When the ALJ asked why he missed work, Plaintiff responded that he "[j]ust couldn't stand being around certain people for, you know, long periods of time" and that he is "[s]ometimes so depressed [he] can't get out of bed." (*Id.*) When asked about other jobs, Plaintiff stated he "got fired each time for going off the handle. I, you know, told my boss, you know, told him off." (*Id.*) When asked whether his depression affects him any other way, Plaintiff stated that he "take[s] it out on other people in the home." (Tr. at 42.) He said that sometimes he leaves the house for days, and sometimes he "just stay[s] locked

12

up and, you know, away from everybody." (*Id.*) Plaintiff stated that he does not have friends and does not socialize, but spends all of his time with his girlfriend and six month-old son that live with him. (Tr. at 42-43, 45.) Plaintiff further stated that during manic stages, he is unable to sleep for more than an hour at a time and that these periods can last for weeks. (Tr. at 43.)

Plaintiff testified that his last grand mal seizure was in 2009 and that, when he has them, he loses control of bodily functions. (*Id.*) Plaintiff stated he also gets other seizures about once or twice a week where he "get[s] a blank stare" and that those last "sometimes minutes." (Tr. at 44.) Plaintiff stated he cleans the house and helps with the baby, especially when he's in a manic phase during which he cleans the same area repeatedly. (Tr. at 45-46.) Plaintiff stated that after a seizure, he wakes up sore the next morning. (Tr. at 46.) Plaintiff also stated that his down periods, where he doesn't leave the house and cries "all the time," last up to three weeks. (Tr. at 47.)

At the administrative hearing, the ALJ asked the Vocational Expert ("VE") to consider a person with Plaintiff's background who

> has a residual functional capacity for work at all exertional levels that would need to restrict themselves to jobs that did not expose him to unprotected heights or dangerous machinery and jobs that involved only superficial, interpersonal contact with coworkers, supervisors, and the public.

(Tr. at 49-50.) The VE testified that such a person could perform the 250,000 assembly positions, 300,000 material handler positions, 125,000 packer positions, and 35,000 laundry worker positions available in the national economy. (Tr. at 50.)

### F.    Analysis and Conclusions

#### 1.    Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, he possessed the residual functional capacity to perform a full range of work at all exertional levels with the following nonexertional limitations: that he is restricted to jobs that would not expose him to

13

unprotected heights or dangerous machinery; and that he is restricted to jobs that involve only superficial interpersonal contact with coworkers, supervisors, and the public. (Tr. at 20-29.)

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.     Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 11.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the ALJ improperly penalized Plaintiff for trying to live a normal life, improperly downplayed the value of the GAF scores, and failed to include nonexertional limitations in the RFC findings. (Doc. 11 at 7-11.)

I first note that the ALJ did incorporate nonexertional limitations into the hypothetical when he stated that the jobs must involve "only superficial, interpersonal contact with coworkers, supervisors, and the public." (Tr. at 49-50.) I also note that the ALJ's failure to rely on GAF scores is of no consequence legally since neither the Commissioner nor the Sixth Circuit requires that GAF scores, even consistent ones, be given any weight at all:

> [T]he Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"

*Kennedy v. Astrue*, 247 Fed. App'x 761, 766 (6th Cir. 2007) (citations omitted).

As to the ALJ's RFC findings, the Physical RFC Assessment concluded that Plaintiff's "seizures are fairly-well controlled, but in consideration of his occasional break-through seizures, he should not work in proximity of moving machinery or off floor level." (Tr. at 295.) If this were the only restrictions of record, I would suggest that the ALJ's RFC findings were supported by substantial evidence. *See Parks v. Astrue*, 304 Fed. App'x 503, 505 (9th Cir. 2008) (Where "RFC found that [his] seizure disorder resulted in limitations only to the extent that []he could not drive, work around dangerous machinery or work at unprotected heights," and the plaintiff's physician did not indicate any limitations other than driving, substantial evidence supported ALJ's RFC findings that were in accord).

However, in the instant case, although the RFC findings stated that Plaintiff's non-break-through seizures were fairly well-controlled, Plaintiff testified that he gets other seizures about once or twice a week. (Tr. at 44.) Although the ALJ noted that Plaintiff had a grand mal seizure on August 30, 2009, when referring to his less serious seizures, the ALJ stated there was "nothing in the record to support this claim." (Tr. at 24.) However, there is evidence of emergency room treatment for other seizures in May 2007, February 2008, and April 2008. (Tr. at 188-90, 196-98, 206-16.) In addition, there is nothing in the record to disprove Plaintiff's claim of even less serious seizures once or twice a week. Only the ALJ challenged Plaintiff's credibility. None of Plaintiff's treating physicians challenged Plaintiff's credibility regarding his claims as to the occurrences of seizures.[3] The ALJ noted that Plaintiff's "seizures have a tendency of occurring if his medication falls below a certain level," implying that any or at least most seizures are due to Plaintiff's failure to take his medicine. (Tr. at 22.) Although the evidence of record indicates that Plaintiff's grand

---

[3] I note that the RFC assessment did state that Plaintiff's "alleged functional limitations are so far-reaching that they lose credibility," but there was no mention of existence or frequency of seizures. (Tr. at 297.)

15

mal seizure in 2009 may have been at least partially caused by his failure to take his medication (Tr. at 310), there is no evidence that the seizures occurring in May 2007, February 2008, or April 2008 were brought about, even in part, by any failure to take medication. (Tr. at 188-90, 196-98, 206-16.) Nor is there any evidence that Plaintiff's weekly seizures are related to a failure to take medication.

In addition, the ALJ's hypothetical did not address Plaintiff's moderate limitations in maintaining concentration, persistence, or pace (Tr. at 284), or his moderate limitations in the ability to understand and remember detailed instructions, to carry out detailed instructions, and to maintain attention and concentration for extended periods. (Tr. at 288-89.) In addition, the hypothetical failed to address or include the assessment's limitation that Plaintiff "is able to perform unskilled work involving 1 and 2 step instructions with limited need for sustained concentration." (Tr. at 290.) I therefore suggest that the decision of the ALJ was not supported by substantial evidence.

### 3. Conclusion

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, was not supported by substantial evidence and recommend that the Commissioner's motion for summary judgment be denied, that Plaintiff's motion for summary judgment be granted and that the case be remanded for an award of benefits.

### III. REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).

Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

|  |  |
|---|---|
|  | s/ Charles E Binder |
|  | CHARLES E. BINDER |
| Dated: March 12, 2012 | United States Magistrate Judge |

**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date: March 12, 2012           By    s/Patricia T. Morris
                                                    Law Clerk to Magistrate Judge Binder

17